UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ANNE M. MARCOUX, JILL LINDSAY, KIRSTEN EVANS, CONSTANCE LaMATTINA, ELIZABETH LEE PRICE, JUDITH ALEXANDER, DEBORAH DEAN, CHRISTINA FORD, PATTI GENTRY, LaTONYA K. GILLMORE, JANET GOLD, DALE HAGAR, JULIE HORAN, LOUIS HORTER, CAROL JOHNSON, MOLLY KAIMAN, BEVERLEY KALKHOF, NANCYANNE KELLO, PATRICIA KENNEDY, JANET KIRBY, JOHN KLINE, DOTTIE LONG, KAREN RIVOIRA, LAURENCE E. SALOMON III, DANIEL SANTIAGO, REBECCA SMITH, and DEBORAH WHITTINGTON on Behalf of themselves and all others similarly situated (i.e., the "Class"); CONSTANCE LaMATTINA also on behalf of Subclass I, KIRSTEN EVANS, JILL LINDSAY and ELIZABETH LEE PRICE also on Behalf of Subclass II; DEBORAH WHITTINGTON also on Behalf of Subclass III, and JANET KIRBY also on Behalf of Subclass IV,

<table>
<tr><td style="text-align:center">Plaintiffs,</td><td style="text-align:center">OPINION AND ORDER</td></tr>
<tr><td style="text-align:center">-against-</td><td style="text-align:center">04 CV 1376 (NG)(KAM)<br>03 CV 4987 (NG)(KAM)<br>04 CV 634 (NG)(KAM)</td></tr>
</table>

AMERICAN AIRLINES, INC., A.M.R. CORPORATION, ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, and JOHN WARD, as President of Association of Professional Flight Attendants,

Defendants.

-------------------------------------------------------------------X

GERSHON, United States District Judge:

Plaintiffs bring this action against Defendants American Airlines, Inc. ("American," or the "Company"), A.M.R. Corporation ("AMR" or, together with American, the "Company Defendants"), the Association of Professional Flight Attendants ("APFA" or the "Union"), and John Ward, in his capacity as President of APFA ("Ward," also included in "APFA" or the "Union"). In light of this court's previous Order, *see Marcoux v. Am. Airlines, Inc.*, 2006 U.S. Dist. LEXIS 14130 (E.D.N.Y. March 28, 2006), remaining against Company Defendants are hybrid claims for breach of the duty of fair representation ("DFR") and violations of the Railway Labor Act ("RLA"), 45 U.S.C. §§151 *et seq.*; remaining against APFA are claims for breach of the DFR and breach of the APFA constitution.

All defendants move for summary judgment dismissing the remaining claims. Plaintiffs move for class certification and for summary judgment on all claims except the claim against APFA for breach of the APFA constitution. For the reasons set forth below, the motions for summary judgment filed by Company Defendants and APFA are granted in their entirety; plaintiffs' motion for summary judgment is denied, and their motion for class certification is denied as moot.

## FACTS

Unless otherwise indicated, the facts set forth below are undisputed.

American is a "carrier by air" within the meaning of the RLA, 45 U.S.C. § 181. AMR is the publicly-traded parent company of American. At all pertinent times, APFA was the certified and exclusive representative of the class of flight attendants employed by American and is a "labor organization" within the meaning of the RLA. Ward served as President of APFA from April 2000 through August 2004. At all pertinent times, plaintiffs were members of APFA.

# I.  The 2001 Collective Bargaining Agreement and Events Leading to Negotiation of the Restructuring Participation Agreement

## A.  Collective Bargaining Between APFA and American Between 1998 and 2001

Between 1998 and 2001, APFA and American engaged in Section 6 negotiations under RLA, 45 U.S.C. § 156.[1]  In June 2001, on the last day of the "cooling-off" period, APFA and American reached a tentative agreement on the terms of a new Collective Bargaining Agreement (the "2001 CBA"[2]).  The tentative agreement provided "industry-leading wages" and working conditions and was ratified by a 96% affirmative vote of the APFA membership, tabulated on September 12, 2001. The CBA was to continue until becoming "amendable" on November 30, 2004.[3]  Early in 2001, as part of what would come to be known as the "turnaround plan," American responded to financial difficulties by altering its business plan to remain competitive with low-cost carriers.

---

[1] Under the RLA, disputes over the terms of new collective bargaining agreements, or "major disputes," *see Pan American World Airways, Inc. v. International Brotherhood of Teamsters, etc.* ("*Pan Am*"), 894 F.2d 36, 38 (2d Cir. 1990), are governed by the procedural requirements of RLA Section 6, 45 U.S.C. § 156. When a collective bargaining agreement is nearing expiration and one party seeks changes, that party must serve the other party with notice of proposed changes.  The dispute is then subject to mediation under the auspices of the National Mediation Board. During mediation neither party may resort to any self-help measures, e.g., strike, work slow-down, etc.  If mediation is unsuccessful and one or both of the parties refuse to submit the controversy to arbitration, the parties must then observe a thirty-day "cooling-off" period.  *See* 45 U.S.C. § 155(b); *Burlington N. R.R. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 445 (1987). Once the cooling-off period has expired without an agreement, the parties may then resort to economic force.  *See Pan Am*, 894 F.2d at 38.

[2] Although the CBA reached in 2001 was retroactive, becoming effective as of November 1, 1998, the court will refer to it as the "2001 CBA."

[3] "An 'amendable' date typically provides that the agreement will continue through the amendable date and thereafter unless written notice of intended change is served in accordance with RLA Section 6 within a specified period prior to the amendable date."  *Northwest Airlines Corp. v. Ass'n of Flight Attendants-CWA*, 349 B.R. 338, 349 n. 4 (S.D.N.Y. 2006), *aff'd*, 483 F.3d 160 (2d Cir. 2007).

### B.   September 11, 2001

As a result of the terrorist attacks of September 11, 2001, the major airlines suffered billions of dollars of losses.  American's net loss in 2002 was $3.5 billion and it projected an additional loss of $1 billion in the first quarter of 2003.

Thus, in 2002, after comparing its labor costs to those of its competitors, American developed a cost-cutting strategy relating to its pilots, mechanics, flight attendants, and other non-labor sources.  American decided it needed to cut labor costs associated with the flight attendant group by $340 million annually to remain competitive.  It also identified $2 billion in annual cost reductions that could be obtained through sources other than labor.  Notwithstanding these cost-cutting plans, American, during this period, funded a retirement plan providing bankruptcy-protected pension benefits to senior officers.  *See below* Facts § IV.

By letter dated December 6, 2002 from American's then-CEO, Don Carty ("Carty"), and its then-President, Gerard Arpey ("Arpey"), American requested that APFA, as well as the Allied Pilots Association ("APA"), and the Transport Workers Union ("TWU"), the bargaining representative for the Company's mechanics and other ground employees, agree to forgo two upcoming compensation increases provided under the 2001 CBA, namely, a 3% pay increase scheduled to take effect January 1, 2003, and a further increase scheduled to take effect in July 2003.  American recognized at the time that, even if APFA agreed to the requested concessions, American's economic turnaround would not be complete.  American stated that the concessions were non-negotiable.

In response to American's December 2002 request to forgo pay increases, APFA informed the Company that it would conduct a detailed review of the Company's finances to determine if there was a legitimate need for the relief American sought.  APFA retained Mark King as a financial

advisor to assist with its review of American's finances. King had assisted the APFA Negotiating Committee in the negotiations that led to the 2001 CBA. By January 1, 2003, however, APFA's financial review had not yet concluded, and the Company implemented the 3% pay increase as required under the 2001 CBA.

### C. American's Requests for Labor Concessions and APFA's Initial Response

The Company's financial condition declined in the first quarter of 2003 to a greater extent than previously projected. American was losing cash from operations at the rate of approximately $5 million per day – nearly $7.5 million per day if capital expenditures and debt service were included, and between $14 and $21 million per day if pension contributions were included.

In early February 2003, the Company made additional demands for cost-saving contractual concessions from each of its unions, including APFA. Specifically, it demanded $1.6 billion in annual "permanent" labor cost reductions, i.e., cost savings of $1.6 billion per year on an ongoing basis, from APFA, the APA, and TWU. Of this amount, the Company indicated that $340 million annually would be required from the flight attendant workforce.

Soon after APFA received American's February 2003 demand for concessions, Ward convened a meeting of the APFA Board of Directors ("BOD") on February 11-12, 2003.[4] The BOD

---

[4] The APFA Constitution, Art. III, § 3(A), provides:

> The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret this Constitution and to establish, prescribe and adopt such other policies which may be consistent with this Constitution as required for the direction and management of the affairs of the APFA.

"received a thorough briefing and analysis from [its] . . . advisors and a presentation from the APFA Negotiating Committee." Ward Dep. 257-58. On February 12, 2003, the BOD adopted a resolution stating that

> APFA is committed to the survival of the Company and recognizes the importance to the membership of taking appropriate steps to ensure that the Company is a viable and successful entity which, at the same time, respects the needs and legitimate rights and expectations of its employees and specifically of the American . . . flight attendants.

It further provided for "a comprehensive, multi-faceted plan of action" designed to continue APFA's financial analysis of the Company and prepare for concessionary negotiations that might ensue. The BOD directed "the Negotiating Committee, under the direction of the APFA President, . . . to take all necessary action . . . to be able to expeditiously address varying contingencies." *Id*. The BOD's "overriding obligation was to . . . best protect the interests of the Flight Attendants." President's Report, Ward Ex. 10.

### D. *Risk of Bankruptcy*

In late February or early March 2003, American CEO Carty informed APFA, at a special APFA BOD meeting, that American would file for bankruptcy protection unless it obtained an agreement from APFA by March 31, 2003 that provided the $340 million in annual cost reductions that American was demanding. American set the same deadline for APA and TWU to reach agreements, in the absence of which the Company would file for bankruptcy.

The APFA BOD met again in the second week of March 2003. At that meeting, it adopted a Resolution dated March 10, 2003 stating, "the best interests of the membership will be served by taking all appropriate action to expeditiously address the Company's financial situation," and directing APFA President Ward and the APFA negotiating team and advisors "to take any and all

actions needed to reach a negotiated consensual agreement with American . . . in order to avoid bankruptcy."  The BOD adopted this Resolution after receiving "presentations regarding the Company's financial situation and the time constraints from APFA's outside economic consultant, . . . APFA's Standing Negotiating Team," and "representatives of TWU, APA and American Airlines concerning the validity of the [Company's] request [for concessions] . . . ."

To assist APFA in its dealings with American, APFA retained, in addition to King, Leon Potok (another financial advisor), to further assess the Company's financial situation.  APFA's advisors reviewed publicly available information and information provided by the Company, consulted with advisors retained by APA and TWU, and conferred with APFA's Negotiating Team, the Union's Officers, and Company representatives.  American "made its financial plans and backup information available to [APFA] and to [its] financial advisors . . . to a far greater extent than it ever had done before."  President's Report, Ward Ex. 10.[5]

On February 11, 2003, King advised the APFA negotiating team in a power point presentation that the relief APFA should grant the company should be of a short-term nature because American faced a short-term cash problem.  He further advised APFA that, because American was forecasting improvement,  "it would be desirable to wait until May or June to determine whether cash relief is needed."  King Dep. 65-66.  However, in March 2003, King revised earlier evaluations and concluded that American's financial situation was deteriorating faster than he had previously believed, although he "never completely agreed with the company's position that it was deteriorating as quickly as it said it was."  *Id*. at 144-45.

---

[5] Later, APFA learned that American had not shared with APFA information regarding its bankruptcy-protected retirement plan for senior officers.  *See below* Facts § IV.

Potok reached the conclusion that American's requests for financial concessions were warranted. At his deposition, he explained his conclusion:

> The company had lost significant amount of money, it was projecting to lose a significant amount of money, it was not simply a cyclical problem they were facing, it was structural, they had to address, as did the other main line airlines, and in the absence of fixing their problems no prudent management or board would continue coasting along throwing money out the windows.

Potok Dep. 212-13. He recalled that, in March of 2003, he advised APFA with regard to whether the management of American had a basis for seeking Chapter 11 bankruptcy protection:

> The company was seeking to get cost reductions in a time when it was in a negative cash flow, projected negative cash flow situation. And in the absence of such cost savings and in the absence of a deal with labor, it was reasonable to expect that the company would file for Chapter 11.

*Id.* at 37. Based on the analysis and presentation of APFA's financial advisors, APFA's leadership concluded that American's threats to file for bankruptcy in the absence of concessions were serious.

## II.     March 2003 APFA-American Discussions Lead to a Tentative Agreement

### A.     *The APFA-American Discussions*

In March 2003, American advised APFA that, if the Company filed for bankruptcy, it intended to reduce its aircraft fleet by 85 to 90 planes, with the consequence that at least 2,500 flight attendants would be furloughed over and above the furloughs that would result from implementation of the $340 million concessionary agreement. Also, in bankruptcy, American would seek at least an additional $130 million a year in cuts above the concessions it was seeking out of bankruptcy and lay off substantially more employees. These additional concessions would have been required to offset the substantial costs associated with bankruptcy. The Company communicated both privately and publicly to the three unions that it was prepared to file for bankruptcy on March 31, 2003.

During these discussions, neither side served the other with a Section 6 notice or said it was proceeding under Section 6 of the RLA. Both sides recognized that the changes to the CBA sought by American were substantial.

To provide information to flight attendants regarding the negotiation process, Ward recorded a telephone hotline message accessible to union members. He stated that APFA was willing to make concessions because, "as dreadful as the Restructuring Agreement is, the Company's bankruptcy proposal – that is what they would seek to achieve in bankruptcy from the court – is far worse." APFA Hotline Message, April 4, 2003.

Also during this period, APFA issued an update to membership stating:

> The three labor unions, after exhaustive research by each union's economic advisors, have determined that [American] is in serious financial trouble. This situation is deteriorating rapidly. . . .
>
> The APFA Negotiating Table Team . . . [is] working tirelessly to come up with a consensual tentative agreement on a concessionary package. How much this package will be worth (as compared to the Company's $340 million request) has not yet been agreed to by the parties. However, [American] indicates it needs the full amount to avoid a bankruptcy filing. . . .
>
> If . . . a package is concluded then it will then be submitted to the membership for a ratification vote. . . . If any single group rejects their respective package, the Company represents that it will likely be filing for bankruptcy.
>
> The APFA Leadership believes avoiding bankruptcy is in our membership's best interest. Bankrupt airlines often shrink operations, furlough employees and use the bankruptcy laws to abrogate parts of union contracts. Use of the Section 1113 process of the federal bankruptcy law may cause greater sacrifices in areas we do not necessarily desire.
>
> Because APFA is acting responsibly, it is seriously attempting to avoid bankruptcy. . . . [W]e still believe that obtaining an agreement between the parties is likely to be better than leaving the decision to

a bankruptcy judge. Because of this, we will try to reach a deal regardless of how pessimistic things look.

American provided the restructuring terms on a take-it-or-leave-it basis. In mid-March 2003, American established unilaterally an April 15, 2003 deadline for APFA, TWU and APA to complete their respective membership ratification processes on the agreements they were required to reach with American by March 31, 2003, and informed the three Unions that, if they did not provide ratified agreements by the April 15, 2003 deadline, the Company would file for bankruptcy. Ward informed American that the APFA Constitution required a 30-day balloting period. American refused to extend the deadline.

During discussions in the second half of March, American adhered to its previously-stated position that APFA would have to provide $340 million per year in cost savings to the Company and that anything less was unacceptable. During this time period, the Company stated that the Union could make proposals regarding the specific concessions to be included in the agreement, but the overall package would have to result in total annual savings valued by the Company at $340 million. APFA attempted to interject its own terms, but American was not receptive to them. Rather, American provided APFA with a list of possible concessions and placed a value on each. Steve Boilini, a flight attendant and member of APFA's negotiating committee, interpreted the BOD's direction to "take any and all necessary actions needed to reach a negotiated consensual agreement" to mean that "the negotiating team wasn't going in to actually negotiate. . . . [W]e were going in to do anything we could to make sure American Airlines did not go bankrupt." Boilini Dep. 25. Mr. Boilini understood it was the negotiating team's purpose to conclude an agreement. *Id*. The APFA leadership felt that American had "a gun to our heads." Ward Dep. 119-22. The situation "was nothing [APFA] had ever experienced before." Liz Mallon (member of APFA BOD) Dep. 113-14.

To meet the $340 million figure solely through wage cuts would have required reductions in flight attendant wage rates of 35%. APFA determined to avoid a wage reduction of this magnitude, demanding that alternative concessions be included in the overall agreement. During the last two weeks of March 2003, APFA proposed contractual "snapbacks" providing a return to pre-concession terms and conditions of employment during the life of the agreement, as well as significant pay raises while the agreement remained in effect. The Company refused these requests because it viewed the concessions, not as a short-term change, but "a change in how the airline was going to operate in the future. . . . [W]hat [American was] doing would permanently change the company in light of what was happening in the industry." Jeffrey Brundage (former American Vice President of Employee Relations) Dep. 342-43. APFA also proposed other "upsides" for the flight attendants, e.g., unlimited recall rights for furloughees and a profit-sharing program, both of which were rejected by the Company. The Company sought to eliminate the flight attendants' defined benefit pension plan. APFA resisted these changes.

**B.      *The Company's Bankruptcy Preparation and Section 1113 Proposal***

The Company retained legal and financial advisors to help prepare for a bankruptcy filing. The Company also discussed with a group of financial institutions an arrangement to provide $1.5 billion in financing for the Company's operations while in bankruptcy. The Company intended to file for bankruptcy on April 15, 2003 if all three Unions did not ratify agreements by that date.

Shortly before the Company's March 31, 2003 deadline for the three unions to reach agreements with American, the Company provided APFA with its "§ 1113 Proposal" detailing the cost reductions the Company would seek from its flight attendants under the Bankruptcy Code if the Company filed for bankruptcy. The § 1113 Proposal contained flight attendant cost reductions of

$470 million annually, i.e., $130 million a year more than the reductions the Company was requiring in a consensual agreement with APFA. The company indicated that, over and apart from additional furloughs that would result from implementation of the $470 million in annual cost reductions contained in the § 1113 Proposal, the grounding of 85 to 90 aircraft that the Company intended to effectuate if it filed for bankruptcy would result in 2,500 additional flight attendant furloughs.

### C.     APFA and American Reach a Tentative Agreement on March 31, 2003

The APFA negotiating team reached a tentative Restructuring Participation Agreement ("RPA" or "Restructuring Agreement") with the Company on March 31, 2003. The tentative RPA contained a 15.6% wage cut; reductions in some "premium pay" categories; a 33% reduction in vacation; reductions in the per diem, layover rest time, sick leave and the monthly guarantee; waiver of crew meals; and a number of work rule changes that would result in the need for fewer flight attendants to perform the assigned work. It was estimated that the work rule changes would result in 2,391 flight attendant furloughs. The RPA, as initially agreed to, was to become amendable on April 30, 2009.

On March 31, 2003, the RPA was submitted to the APFA Executive Committee. The Executive Committee received a briefing from the negotiating team on the RPA and adopted a Resolution that included the following determinations: (1) the APFA President and negotiating team had "vigorously attempted to secure the best agreement that could be reached under the circumstances, given the serious, substantial threat of an imminent bankruptcy filing" by American; (2) the tentative RPA was "the best proposal that could be obtained under the circumstances and taking into consideration the serious, substantial threat of an imminent bankruptcy filing"; (3) "if agreements are not ratified by the Company's employees, there is a great likelihood that the

Company will promptly file a bankruptcy petition and that, in the event of such a filing, there is a strong likelihood that the APFA-represented flight attendants will suffer a reduction in wages and working conditions which exceeds those provided" under the tentative RPA; and (4) "given this reality and in light of the circumstances presented . . . the best interests of the APFA-represented flight attendants will be furthered by ratification of the Company proposal presented to the Executive Committee for its consideration." The Executive Committee directed the tentative agreement be submitted to the APFA membership for ratification. At this point, the parties had yet to agree on final contract language.

## III. The Balloting Process

### A. The BOD's Adoption of an Expedited, Telephonic Balloting Procedure

The APFA Constitution requires that a ratification vote on a tentative agreement be conducted via mail-in ballot over a 30-day period commencing with the distribution of the agreement's final language.[6] Art. XI § 1(C), (E)(2). Ward voiced strong concerns with the

---

[6] With regard to ratification, APFA Constitution Art. XI §1 provides:

A.  A proposed Collective Bargaining Agreement will be submitted to the affected membership for approval only after it has been accepted by a majority vote of the Negotiating Committee and presented to the Executive Committee.
    (1) Should the Executive Committee reject a proposed agreement, the Negotiating Committee shall present the proposed agreement to the Board of Directors.
    (2) The Board of Directors may decide to submit the proposed agreement to the membership for approval.
B.  . . .
C.  The affected membership shall be given the complete changes to a Collective Bargaining Agreement prior to or at the start of the balloting period.
D.  A proposed Collective Bargaining Agreement shall be ratified by an affirmative vote by a majority of those active members

13

Company's imposed ratification deadline, but the Company reiterated that it would file for bankruptcy if the Union did not meet the April 15 ratification deadline. If the membership ratification vote was conducted over a 30-day period, the balloting would conclude after the Company-imposed April 15, 2003 deadline and thus, as per the Company's threats, after the Company had filed for bankruptcy.

On March 19, 2003, the APFA BOD had met by teleconference to discuss how to conduct a membership ratification vote if a tentative restructuring agreement were reached between APFA and American. During its deliberations, the BOD received a memorandum dated March 17, 2003

---

in good standing covered by the applicable Agreement who return valid ballots. Members may vote only on those agreements which apply to their respective airline(s), unless covered under a master agreement.

    E.    Balloting:

        1.    The sole issue to appear on the secret ballot shall be the ratification of the Collective Bargaining Agreement.

        2.    The time limit for the return of ratification ballots (the Balloting Date) shall be not less than thirty (30) days after the mailing of the ballots to the respective membership.

    F.    Any letters of agreement or side letters entered into between an employer and the APFA during or outside of the Collective Bargaining negotiations which alter the rates of pay, rules, or working conditions for covered Flight Attendant employees shall be subject to ratification by the Executive Committee. If the Executive Committee determines that the alteration is substantial, such letter of agreement or side letter shall be submitted for ratification to the membership covered by the applicable Agreement pursuant to the procedures outlined in this Article XI.

    G.    Upon ratification by the membership, a Collective Bargaining Agreement and/or letters of agreement shall be deemed binding.

from the APFA Constitution Committee that had drafted the APFA Constitution. This group of former union leaders reported to the BOD that it had unanimously agreed to the following:

> in drafting the Constitution, the Committee never contemplated the potentially urgent need for ratification that can arise – as it apparently has now – in the context of concessionary bargaining. We are confident that had we considered that issue, the Committee would have drafted and recommended an expedited ratification process. Tellingly, in the one situation the Committee did anticipate in which there is an urgency to ratify – reaching an agreement to end a strike – the Constitution does provide for a very quick ratification procedure. (See Article XI.2.) Moreover, the Constitution grants the Executive Committee and the Board of Directors broad powers to take necessary actions to protect and promote the interests of APFA members.

> In light of these provisions, we believe that inherent in the Constitution is Executive Committee and Board of Directors power to deal with a bona fide emergency. Even though the explicit time frame in Article XI.E(2) is 30 days, it would be inconsistent with the spirit of the Constitution to sacrifice the interests of the membership in the name of compliance with a provision that was never intended to govern the exigent situation now confronting us.

> Therefore, the Constitution Committee strongly urges APFA to file a lawsuit in Texas state court in Tarrant County seeking a declaratory judgment that the Executive Committee has the constitutional authority to shorten the ratification period if APFA and the Company reach agreement on modifications to the contract. . . . APFA legal counsel would be able to advise the Executive Committee and the Board of the impact such a declaratory judgment would have on potential member challenges to a shortened ratification period. An additional option would be to ask the Company to indemnify APFA for any legal costs and liability that arise if APFA members sue the Union about the ratification issue.

The APFA BOD passed a resolution interpreting the APFA Constitution to allow for telephonic balloting, stating that telephonic balloting was not available when the current APFA Constitution was adopted and that an alternative to a mail ballot had not been specifically excluded by the Constitution. The resolution provided for a 15-day telephonic balloting process in light of

"this potential unprecedented and time sensitive situation." The BOD also stated that using a mail-in ballot for voting on the RPA "would not be in the best interests of the flight attendants" and that "the potential exigent circumstances [required] an expedited balloting process." APFA provided the March 19, 2003 BOD Resolution to the membership along with information on telephonic balloting.

At its March 19, 2003 meeting, the BOD chose the American Arbitration Association ("AAA") to provide telephonic balloting services. On March 31, 2003, AAA mailed to APFA's members ratification ballots that included instructions for voting by telephone on the tentative agreement. Consistent with established practice at APFA, the balloting period commenced with the March 31, 2003 mailing. However, while ballots were mailed on March 31, no one who accessed the AAA voting system could vote until April 3, 2003, when the system was activated. The balloting deadline was April 15, 2003 at 10:00 a.m. CDT.

B.      *The Membership's Awareness of the RPA's Terms and Final Contract Language*

Throughout the February-April 2003 period, APFA utilized its website and telephone hotline, along with other means of communications, to provide information to the membership on events transpiring, including the Resolutions adopted by the BOD and the Executive Committee.

The APFA Constitution, Art. XI § 1(C), required the membership to receive full contract language at the outset of any ratification balloting process. However, because the tentative agreement was not reached until the Company's March 31 deadline, full contract language had not been finalized prior to the commencement of the ratification period.

On April 1, 2003, and before members began to cast ballots, APFA posted a detailed description of the RPA's terms, as they then stood, on the APFA website; this included all the concessions that had been included to arrive at the $340 million cost reduction figure. APFA also

recommended that flight attendants not vote until they received final contract language.

Also on April 1, 2003, Ward resumed meetings with the Company in order to arrive at final contract language. However, the terms tentatively agreed upon on March 31, 2003, were not finalized until April 8, 2003. Upon finalization, the contract language was posted on the APFA website and mailed by APFA to the membership. Even after this language was submitted to the membership, and continuing until April 14, 2003, APFA attempted to negotiate further terms providing benefits to the membership.

On April 9, 2003, APFA conducted a nationwide Webcast to provide members with a detailed review of the RPA. Members could either view the Webcast at select meetings across the country or via a personal computer. However, technical difficulties ensued, and many members could not view it. After April 9 and for the remainder of the balloting period, the Webcast remained on the APFA website.

Throughout the balloting process, including during the Webcast, Ward characterized the RPA as a highly concessionary agreement. He urged members to vote, citing the importance of the issues before them.

### C.      Changes to the RPA's Terms After March 31, 2003

Between April 1 and April 14, 2003, various changes were made to the RPA, all potentially beneficial to APFA, including the Company's agreement to (1) shorten the duration of the RPA by four months; (2) permit the Union to serve an early notice to reopen the agreement and begin negotiations in January 2007; (3) provide for the possibility of mid-term wage increases in the event certain financial markers were met by the Company (increases that could supplement the annual 1.5% pay increases that were provided in the RPA); and (4) shorten the time in which stock options

granted to flight attendants in the RPA would vest. APFA made no additional concessions. APFA notified its membership of the post-March 31 changes via the APFA website and Hotline.

### D. APFA Efforts to Secure More Time for the RPA Ratification Process

APFA made several attempts to secure from the Company additional time beyond the April 15, 2003 Company-imposed deadline for completion of the RPA ratification process. It did so (1) to afford members additional time to consider the RPA, including its final language, and the additional enhancements that the Company had agreed to after the balloting had commenced; and (2) to accommodate a number of members who had reported difficulties in obtaining ballots or Personal Identification Numbers ("PINs"). Prior to the scheduled close of the RPA balloting period on April 15, 2003, the Company refused each APFA request for an extension.

In the early morning of April 15, 2003, and before the then-scheduled 10 a.m. CST conclusion of the RPA balloting that day, American's then-CEO Carty convened a meeting with APFA national officers and leaders from the other two Unions. At the meeting, Ward stated that some APFA members were having "problems getting [PIN] numbers" and accessing the telephonic vote lines from overseas, Lorraine Mase-Hecker (former American Director of Employee Relations) Dep. 149-50, and understood that others had complained that the final language became available only on April 8, 2003. Also at the meeting, an APA officer indicated that APA had received reports of APFA members expressing to APA-represented pilots a desire for the opportunity to change their votes, as the memberships of APA and TWU had been able to do throughout the balloting. Also, Carty had learned from several sources that, if allowed to re-vote, many flight attendants would change their votes to "yes." Carty believed that, given one more day, the RPA would be ratified.

Following the discussion, Carty offered to permit a brief extension in APFA balloting until

5 p.m. on April 16, 2003, and to defer a bankruptcy filing for this additional day. In response, Ward stated that this was insufficient and requested an extension of several days. The Company refused. Ward stated he would have to present the Company's offer to the BOD.

On the morning of April 15, 2003, Linda Herod-Rivas (American flight attendant and APFA National Balloting Committee ("NBC") member) and NBC member Leatha Harding-Berry were present at AAA's offices in New York City to receive the ballot results scheduled to be tallied that day. Shortly after 10 a.m. CST on April 15, 2003, the AAA informed Herod-Rivas that the initial balloting period had yielded 9,842 "no" votes and 9,309 "yes" votes. Both the APA and TWU memberships ratified the RPA.

### E.     APFA Accepts American's Offer of a One-Day Extension for Balloting

The BOD met by teleconference during the afternoon of April 15, 2003, to consider the Company's offer of a one-day extension. By noon, the BOD learned via news report that ratification had failed.[7]

At the conclusion of the April 15, 2003, teleconference, a majority of the BOD adopted a Resolution stating that the extension offered by American was

> shorter than desired, [but] that the best interests of the membership

---

[7] Plaintiffs appear to challenge the admissibility of all factual assertions regarding what was or was not discussed during the April 15, 2003 BOD meeting on the ground that APFA failed to record it and produce a transcript as required by the APFA Constitution. Factual assertions challenged include: (1) that during the teleconference, arguments were presented both for and against acceptance of the extension; (2) that board members discussed that the other two unions provided members with the option of changing votes throughout the balloting period; and (3) that at least one board member voiced concern that allowing members to change votes could be unfair to members who had discarded their PIN numbers after voting. Assuming APFA did have a duty to record these meetings and produce a transcript, its failure to do so is not a ground for inadmissibility, and plaintiffs offer no other challenge to this evidence.

> will continue to be served by taking all necessary action to avoid a
> bankruptcy filing if possible, and that this can best be accomplished
> under the present circumstances and in light of the intervening events
> . . ., by permitting flight attendants a further opportunity to vote
> and/or to change their votes if they so desire on the Company
> proposal.

The Resolution further states that the BOD's decision to accept the extension and permit members

the option of changing votes was based on several factors, including that (1) final language for the

RPA was completed "several days after the balloting period had commenced"; (2) "additional

agreements" had been reached during the balloting period providing enhancements to the RPA,

"including as recently as 8 p.m. on April 14, . . . which could have impacted the voting if additional

time had been available for consideration by the flight attendants"; (3) "the APFA membership has

voted to reject the Company proposal by a very slim margin"; (4) "there remains a high likelihood

of an imminent bankruptcy filing by the Company"; (5) "in the event of a bankruptcy filing, there

is a strong likelihood that the APFA-represented flight attendants will suffer a reduction in wages

and working conditions which exceeds those provided under the Company proposal that has been

presented to the membership for a ratification vote"; and (6) "a number of flight attendants reported

that they were unable to cast votes and/or [encountered] extensive difficulties and confusion . . . with

the voting process."

APFA informed the Company that the BOD had agreed to the extension. APFA also

informed its members, through its hotline and website, that RPA balloting had been reopened and

would continue until April 16, 2003 at 5:00 p.m. CST and that members could change their votes

during this balloting period. The hotline also notified members that the RPA had not achieved

ratification during the initial balloting period. The RPA ratification balloting reopened at around

4:30 p.m. on April 15, 2003 and continued through 5:00 p.m. CST on April 16, 2003.

*F.*     *Balloting During the Extended Voting Period*

Approximately 1,300 members voted for the first time during the extension period and any member who previously voted was permitted to change her or his prior vote.  Flight attendants who had previously voted had the option of (1) changing a prior "no" vote to a "yes" vote; (2) changing a prior "yes" vote to a "no" vote; (3) voting the same way they previously had voted; or (4) not recasting a ballot, in which case the vote cast during the pre-extension balloting period was counted in the final tally.[8]

At the conclusion of balloting at 5 p.m. CST on April 16, 2003, there were 10,761 "yes" votes in favor of approval of the RPA and 9,652 "no" votes against approval of the RPA.  At this point, APFA and American considered there to be a ratified RPA.  Using records furnished by AAA, the NBC contacted a number of flight attendants identified by AAA as having cast a ballot during the extension period in order to verify that these flight attendants in fact had cast a ballot – but not how they voted – as reflected on AAA records.  Each flight attendant the NBC contacted verified that she or he had cast a ballot during the extension period.

*G.*     *American's Direct Communications With APFA Members*

At or around the commencement of the voting period, American's then-CEO Carty, on "four or five" occasions, made speeches directly to union members in which he said "voting no is a vote for bankruptcy" and "voting no is a vote for additional job cuts."  Carty Dep. 86-87.  He further stated that, if American were to file for bankruptcy, there would be an additional $500 million in employee cost cuts, including the cutting of 1000 more pilot jobs and 2500 flight attendant positions.

---

[8] Plaintiffs question whether flight attendants had the ability to exercise either the third or fourth option.  However, the record evidence reveals nothing to indicate that they did not.

Carty's purpose was two-fold: "[o]ne, make it very clear to our employees what the facts were, and two, I think to hold out to them that in spite of the challenges we were facing and the very difficult decisions we all had to make here, that if we could avoid bankruptcy, there clearly was opportunity going forward." Carty Dep. 89. The speech was written "very much with a carrot[, as opposed to a stick,] in mind." *Id*. Carty "very much wanted to see the company avoid bankruptcy." *Id*. at 90. He believed the only way to avoid bankruptcy at that point was for the unions to ratify the RPAs.

During the balloting extension between April 15 and 16, 2003, the Company again communicated with American flight attendants. American personnel approached flight attendants at airport gates and arranged for a "pop-up" message to appear when flight attendants signed into the computer system upon arriving for work which advised them of the extension and their ability to re-vote. American also prepared a written message, copies of which were placed under the doors of flight attendants' hotel rooms. This message stated:

> The company was advised this morning that the APA and TWU consensual agreements have been ratified. The APFA is the only union that has not yet ratified its agreement. However, the [APFA] has advised us that, unlike the other union groups, once members initially voted, they were not able to change their position, even after the contract was improved during the ratification process.

> In an effort to give flight attendants the same opportunity available to other union employees, and in consideration of the importance of this matter to American, all of its employees and their families, since a final failure to ratify would cause a bankruptcy filing by the Company, the Company has agreed to the APFA's request to extend the voting period until 5 p.m. CDT, Wednesday, April 16 during which time flight attendants will be permitted to change their ballots if they wish to do so. No one is required to vote again. Any votes not changed will be counted as they currently stand.

> This message is to advise you of this development and encourage you to participate in this vital process. If you did not have an opportunity to vote or wish to change your vote you may call the [AAA]. . . .

> Additionally, you can call [the AAA] if you have any questions or have misplaced your PIN number.

Through Americans' computer systems, phone lines, bulletin boards, in hotels, in crew lounges and at airports, the Company provided this message or similar messages to flight attendants regarding the RPA balloting, the extension, and the ability to change votes. One flight attendant, Anne Galazin, was provided information on eight occasions. The repeated communications "frustrated" her, causing her to consider, if anything, changing her "yes" vote to a "no" vote. Galazin Dep. 60-61. Further, according to reports received by APFA, American reimbursed some flight attendants for the cost of telephone calls to the RPA balloting line because their foreign locations prevented them from accessing the 800 number free of charge. Plaintiffs also offer evidence regarding APFA's and American's knowledge of individual flight attendants' ID numbers and perhaps PIN numbers, the manner in which PINs were assigned, and the possibility that flight attendants could surmise others' PINs; they imply a lack of security in the balloting.

American's communications with APFA members "troubled [Ward] greatly . . . [b]ecause the company had no right to insert itself into our internal matter." Ward Dep. 360. Ward recalled hearing other reports that "the company plac[ed] messages at hotels in various layovers, cities, informing flight attendants that they could continue voting, that they could change their vote." *Id.* at 361. Ward "was very upset . . . [and] very angry." *Id.* at 361-62.

APFA considered American's communications to be an inappropriate intrusion into the balloting process. Ward telephoned Carty and Lorraine Mase-Hecker, American's Director of Employee Policy and Relations, in the evening of April 15, 2003, and protested the Company's conduct. On April 16, 2003, Ward faxed a letter to Mase-Hecker which included the following:

> We have received numerous reports of widespread company

interference and coercion in the ongoing ratification process since the decision was made to extend the APFA balloting period through 5 p.m. Central Time on April 16. The Company's actions violate the rights of APFA and the flight attendants it represents under the Railway Labor Act and are directly undermining the ratification process. As I informed you last night, this conduct must stop immediately.

We have been deluged with complaints from flight attendants expressing outrage at the Company's involvement in the Union's internal voting process and at the pressure tactics being employed by the Company. Once again, the Company is showing total disrespect for the flight attendants and for their designated bargaining representative. And once again, the Company has demonstrated its ability to shoot itself in the foot. In simple terms, we are insisting that the Company BACK OFF AND STAY OUT OF OUR VOTING PROCESS.

This warning "did not cause a halt in the company's actions." President's Report, Ward Ex. 10.

The Company stated its position directly to the flight attendants: "a vote for bankruptcy is a vote against 10,000 jobs and the secure future of 100,000 American Airlines employees." Carty Dep. 52-54. The Company took the position that its actions did not overstep the line of permissible communication.

## IV. American Funds Special Bonuses and a Retirement Plan for Company Executives

On the morning of April 17, 2003, the morning after RPA ratification, media reports emerged that 45 Company executives received special retention bonuses and that a Special Executive Retirement Plan (the "SERP") had been funded and would be protected from creditors in the event of bankruptcy. APFA's leadership had no prior knowledge of the retention bonuses or SERPs.

Ward informed members that "[t]he disclosures on April 17 demonstrated that the company had lied and had not provided the 'most complete and reliable information,'" as it had represented. President's Report, Ward Ex. 10. Thus, "[b]ecause of the company's outrageous conduct and the

24

company's highly improper intrusion into our ratification process during the April 15-16 extension period, [Ward] informed the company that a reballot of the membership was essential." *Id.*

On April 22, 2003, the APFA BOD convened and passed a Resolution setting aside the April 16, 2003 ratification vote as "tainted" and directing the NBC to make arrangements to provide for another RPA ratification balloting of the membership because (1) during the 1-day extension, "the Company actively and improperly inserted itself into the ratification process and inundated and pressured APFA members into casting votes and/or changing their votes, despite APFA's protests, including directly to Company CEO Don Carty"; and (2) American had misled APFA when it represented that it had "provided to APFA prior to conclusion of the Agreement information that 'was the most complete and reliable information available to the Company to the best of its knowledge.'" As directed by the BOD, the NBC prepared for a new ratification vote by mail-in ballot over a 30-day period.

## V.    The April 25, 2003 BOD Resolution

On April 23, 2003, a four-person Congressional delegation from Texas met with Carty, other top Company officials, and leaders of the three unions in an effort to resolve the dispute. During this meeting, American argued that the RPA had been conclusively ratified and that APFA could not proceed with a re-ballot. American threatened that, if APFA proceeded with a new ratification vote, it would file for bankruptcy without awaiting the results of the balloting. Nevertheless, American offered certain additional benefits in exchange for APFA's promise to forego a re-vote and honor the April 16, 2003 ratification.

On April 24, 2003, largely as a result of the three unions' demands, Carty resigned as CEO. Gerard Arpey replaced him. APFA, however, declined to drop its challenge.

In the evening of April 24, four APFA Officers met with Arpey. The APFA Officers urged Arpey to defer filing a bankruptcy petition until after APFA completed a new balloting of the APFA membership. They also urged Arpey to eliminate from the RPA, as originally drafted, the modification of the "underfly" provision that had been particularly unpopular with APFA members. Arpey agreed to permit APFA to substitute another concession of equivalent cost-saving value to the underfly provision, but only if, by the morning of April 25, 2003, APFA finalized the agreement and withdrew its prior decision to reballot the membership. Otherwise, American would file for bankruptcy without awaiting the results of the additional balloting.

A BOD meeting was convened by teleconference in the early morning of April 25, 2003 to review the developments of April 23-24, 2003. The BOD believed it must either (1) end the dispute with American by agreeing to finalize the agreement, secure the additional benefits to which the Company had agreed on April 23 and 24, 2003, and not proceed with a new balloting on the RPA, or (2) refuse to do so, understanding that the Company would file for bankruptcy if there were no agreement to resolve the dispute by the morning of April 25, 2003.

Following debate, the BOD adopted a Resolution on April 25, 2003 that, "with great reluctance and under the circumstances presented, withdr[ew] the direction to the [NBC] to proceed to arrange for another ratification vote" and agreed to "significant improvements to the [RPA] which [American] was not willing to provide previously." The Resolution stated that,

> under the circumstances presented, . . . the best interests of the . . .
> flight attendants will be served by securing the significant
> improvements to the . . . APFA Restructuring Agreement to which
> the Company has agreed since the Board of Directors adopted [the
> April 22 Resolution] and by forestalling a Company bankruptcy
> filing, without a further membership vote, rather than proceeding
> with a further membership vote which will eliminate Company
> agreement to provide the significant improvements to the APFA

Restructuring Agreement and result in an imminent bankruptcy filing
by the Company.

The resolution stated that "the Company indicated that it could not await the outcome of an APFA ratification ballot and would file for bankruptcy imminently in light of APFA's announced reballoting." American "agreed to refrain from filing a bankruptcy petition if it receives APFA's agreement at this time, and without a further ratification balloting vote." Notwithstanding APFA's "vigorous attempt[s] to obtain Company agreement to drop its insistence on finalization of agreement on the improvements to the APFA Restructuring Agreement without a further ratification balloting, . . . the Company . . . refused to modify its position on reballoting." Thus, because "there is a strong likelihood that the APFA-represented flight attendants will suffer a reduction in wages and working conditions, and additional resulting furloughs of flight attendants, which exceed those that will result under the APFA Restructuring Agreement," the BOD "authorize[d] the APFA President to sign the April 25, 2003 letter of agreement between [American] and APFA."

## VI.   The April 25, 2003 Letter of Agreement

On April 25, 2003, American and APFA entered into a Letter of Agreement ("LOA") memorializing their "agree[ment] to resolve all disputes which exist between them related to the negotiation, ratification, and final effectiveness of the Restructuring Agreement, dated April 16, 2003." The parties "agreed that it is in their mutual interest to permit the Restructuring Agreement to become binding and effective." The LOA made the RPA effective beginning May 1, 2003. The LOA was never submitted to the membership for ratification.

The LOA reflected items to which American agreed subsequent to April 22, 2003, including the following changes to the RPA: (1) a further shortening of the duration of the RPA; (2) a new option for the unions to seek to reopen the RPAs after three years; and (3) a new Annual Incentive

Program, which would be more likely to lead to additional payments to the unionized employees, including the flight attendants, than "the Variable Wage Adjustment plan" that had been included in the RPA.  With the exception of APFA's promise not to seek a new ratification vote, no other concessions were required by American of APFA.

The parties dispute whether the LOA required membership ratification.  APFA asserts that the "enhancements" to which the Company had agreed, on April 23 - 24, 2003, did not reflect "major changes" to the contract with American, such as a change in rates of pay or work rules, and therefore that the LOA did not require membership ratification.  Plaintiffs assert that

> each of the following tentative or proposed agreements had to be ratified by the APFA membership: the RPA as originally formulated on March 31, the RPA as amended through April 8, the RPA as amended through April 14, the RPA as amended through April 25 and/or the April 25th LOA in isolation.

The RPA has been in effect since May 1, 2003.

## PROCEDURAL HISTORY

The named plaintiffs are twenty-five individuals presently and/or formerly employed by American as flight attendants.  Each named plaintiff is a present or former member of APFA and each was a member of APFA between December 2002 and May 1, 2003.  The present case caption reflects three related cases filed in three different venues: *Marcoux, et al. v. American Airlines, Inc., et al.* (No. 04-1376) ("*Marcoux*"), in the United States District Court for the Southern District of New York; *Ford, et al. v. APFA, et al.* (No. 03-4987) ("*Ford*"), in the United States District Court for the Eastern District of New York; and *Lindsay v. APFA, et al.* (No. 04-0634) ("*Lindsay*"), in the Superior Court for the Central District of California, subsequently removed to the United States District Court for the Central District of California.  *Marcoux* and *Lindsay* were transferred to this

court and consolidated based in part on their being related to each other, to *Ford*, and to the claims

set out in the Supplemental Complaint filed by plaintiffs in *Cooper, et al. v. TWA Airlines, LLC, et*

*al.*, (No. 02-3477) (E.D.N.Y.).  *See Cooper v. TWA Airlines, LLC*, 2005 U.S. Dist. LEXIS 41007

(E.D.N.Y. July 18, 2005); *Cooper v. TWA Airlines, Inc.*, 349 F. Supp. 2d 495 (E.D.N.Y. 2004);

*Cooper v. TWA Airlines, LLC*, 274 F. Supp. 2d 231 (E.D.N.Y. 2003).

Plaintiffs seek an order setting aside the RPA, a declaratory judgment, specific performance

of the 2001 CBA, "back wages and benefits plaintiffs would have received but for the imposition

of the unlawful agreement," "reinstat[ment of the] flight attendants who were furloughed as a result

of the imposition of the [RPA]," compensatory damages from all defendants, and punitive damages

from APFA.

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c)*; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A "genuine"

issue of material fact exists where  "the evidence is such that a reasonable jury could return a verdict

for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   That

multiple parties "move for summary judgment does not guarantee that there is no material issue of

fact to be tried."  *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir. 1988).  "In

determining whether there is a genuine issue of fact, the court is required to assess each motion on

its own merits and to view the evidence in the light most favorable to the party opposing the motion,

drawing all reasonable inferences in favor of that party." *Id.*, citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If, in light of the burdens of production and proof that would be required at trial, there is sufficient evidence favoring the non-movant such that a reasonable jury could return a verdict in that party's favor, a genuine issue of fact exists and summary judgment is not properly granted. *Anderson*, 477 U.S. at 248. Thus, the party seeking summary judgment bears the burden of showing that no genuine factual dispute exists, but the party bearing the burden of proof at trial must, in order to survive summary judgment, make a sufficient showing on the essential elements of its case. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884 (1990). Where the party bearing the burden at trial fails to make this showing, the movant is entitled to judgment as a matter of law. *Id.*

## II.    Plaintiffs' RLA Claims

### A.    RLA Section 152 Seventh

Section 152 Seventh provides:

> No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act.

45 U.S.C. § 152, Seventh.[9] Plaintiffs claim that the RPA, an agreement that changed the rates of pay and working conditions of APFA's members as embodied in the 2001 CBA, was formed in a manner inconsistent with the requirements of Section 152 Seventh. Therefore, they argue, by complying

---

[9] For a discussion of Section 6 of the RLA, *see above* n.1. Section 152 Seventh is one of several "status quo" provisions in the RLA which require parties to a CBA governed by the RLA to maintain, during the pendency of any dispute arising under their CBA, the working conditions in place prior to inception of the dispute. *See Northwest Airlines Corp. v. Ass'n of Flight Attendants-CWA*, 483 F.3d 160, 167 (2d Cir. 2007).

with it, American violated this provision's status quo requirement. Company Defendants argue that only certified representatives, not individual employees, may bring suit under Section 152 Seventh.

Although RLA Section 152 does not expressly grant a private right of action, *see Bensel v. Allied Pilots Association, et al.*, 387 F.3d 298, 318 (3d Cir. 2004), courts have recognized an implicit private right of action under Section 152 Seventh on behalf of a union against an employer seeking to challenge the employer's unilateral changes in wages and conditions of employment previously fixed by a collective bargaining agreement. *See, e.g., Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines*, 55 F.3d 90, 93 (2d Cir. 1995); *International Assoc. of Machinists & Aerospace Workers v. Aloha Airlines, Inc.,* 781 F.2d 1400, 1408 (9th Cir. 1986). However, that a private right of action may be implied on behalf of a union "does not imply that Congress intended to create a private right of action for any group or groups of individual employees claiming to act on behalf of the relevant employees." *Bensel*, 387 F.3d at 319 (addressing RLA Sections 152 Second and Ninth).

Plaintiffs point to no case where a court has implied a private right of action on behalf of individual employees under Section 152 Seventh. Indeed, of the RLA's several provisions, a private right of action on behalf of individual employees has been implied only as to Section 152 Third and Fourth. *Id.* at 318. Unlike the other provisions of Section 152, Section 152 Third and Fourth "prohibit carriers from discriminating against *employees* in connection with union organizing activities." *Id.* (emphasis in original). Thus, addressing whether an implied right of action may be found under Section 152 Second and Ninth, the Third Circuit found that, "[u]nlike 45 U.S.C. § 152, Third & Fourth, which are directed specifically at the employer's relationship with *employees*, 45

U.S.C. § 152 Ninth & Second are directed at the employer's relationship with the certified *representative*." *Id.* at 319 (emphasis in original).[10]

Like the provisions analyzed in *Bensel*, Section 152 Seventh is directed at the employer's relationship with the employees' certified representative, prohibiting carriers from unilaterally changing "rates of pay, rules, or working conditions of its employees, *as a class as embodied in agreements*." 45 U.S.C. § 152, Seventh (emphasis added). Thus, only APFA, as the flight attendants' certified representative, could claim a private right of action under this Section. Permitting a private right of action on behalf of individual employees under Section 152 Seventh is inconsistent with this provision's purpose "to impose an obligation on the parties to make every reasonable effort to negotiate a settlement . . . [and] avoid strikes." *Bensel*, 387 F.3d at 315 (addressing the "status quo provisions," including Section 152 Seventh). Section 152 Seventh, designed to foster agreement, would be undermined were individual employees empowered to invalidate settlements previously negotiated by their certified representative and designed to prevent bankruptcy. *Cf. id.* at 319 ("Allowing a group or groups of individual employees to bring a cause of action under section 152, Second or section 152, Ninth of the RLA would undermine the

---

[10] Section 152 Ninth provides, in pertinent part, that the National Mediation Board shall resolve "disputes as to who are the representatives of the employees designated and authorized in accordance with the requirements of this Chapter" and to certify a designated union as bargaining agent. 45 U.S.C. § 152, Ninth. It provides further that "upon receipt of such certification the carrier shall treat with the *representative* so certified as the representative of the craft or class for the purposes of this Chapter." *Id.* (emphasis added). Section 152 Second provides that "all disputes between a carrier . . . and its . . . employees shall be considered, and, if possible, decided, with all expedition, in conference between *representatives designated* and authorized so to confer, . . ." 45 U.S.C. § 152, Second (emphasis added).

provisions' purpose of providing for an organized process of negotiation between one employee representative and the employer, and could lead to chaos.").[11]

Company Defendants' motion for summary judgment with regard to plaintiffs' RLA Section 152 Seventh claim is granted.

## B.      RLA Section 152 First[12]

Section 152 First provides:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First.[13]  Plaintiffs claim that, by not reverting back to the 2001 CBA after recovering from its near-bankruptcy status, American failed to maintain the 2001 CBA in violation

---

[11] Company Defendants have treated the absence of an implied right of action as a "standing" issue. Plaintiffs in response have argued that they meet the standing requirements of Article III of the Constitution. The parties' approach is not to the point. The issue is whether the plaintiffs, as individual employees, are entitled, under the RLA, to bring suit. Also, that plaintiffs seek Rule 23 class certification does not alter the fact that they are not, even as a group, the certified representative contemplated by the RLA.

[12] Plaintiffs' Amended Complaint does not contain a claim under RLA Section 152 First, but they nonetheless move for summary judgment on such a claim and the parties have briefed the claim. For the reasons in the text, even were plaintiffs granted leave to amend, the claim cannot survive.

[13] Unlike Section 152 Seventh, which is one of the RLA's "explicit status quo requirements," Section 152 First is an "implicit status quo requirement" because it may be invoked "either to ensure effective compliance with the explicit status quo provisions . . . or to further justify an injunction premised primarily on those provisions." *Northwest Airlines*, 483 F.3d at 167 n.1, 167-68 (citations omitted).

of RLA Section 152 First. Company Defendants argue that Section 152 First, like Section 152 Seventh, gives no private right of action to individual employees.

Like Section 152 Seventh, Section 152 First is directed at the employer's relationship with the employees' certified representative. Where a union has been certified to act on the employees' behalf, making and maintaining agreements on their behalf is fundamentally the province of that union. *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967). As the Supreme Court noted there:

> National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.

*Id.* Further, plaintiffs' position that Section 152 First, which, *inter alia*, directs parties to "settle all disputes," is directed at the employer's relationship with individual employees rather than their union is untenable when Section 152 First is viewed, as it must be, *in pari materia* with Section 152 Second, which states:

> *All disputes* between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between *representatives designated and authorized* so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

45 U.S.C. § 152, Second (emphasis added); *see also Northwest Airlines*, 483 F.3d at 168 ("carriers and *unions* must 'exert every reasonable effort to make [agreements] . . . and to settle all disputes'") (emphasis added), citing 45 U.S.C. § 152, First; *id.* (Section 152 First "'at least requires the

employer to meet and confer with the *authorized representative of its employees*.'") (emphasis added), citing *Virginian R. Co. v. System Federation No. 40*, 300 U.S. 515, 548 (1937).

Again, as with Section 152 Seventh, the purpose of Section 152 First – "to avoid any interruption to commerce or to the operation of any carrier," 45 U.S.C. § 152 First – would be undermined were individual employees permitted to bring suit seeking to invalidate agreements negotiated by their union and designed to avoid such interruptions.

Company Defendants' motion for summary judgment with regard to plaintiffs' RLA Section 152 First claim is granted.

## C. RLA Section 152 Fourth[14]

Section 152 Fourth provides, in pertinent part:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. . . . No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions. . . .

---

[14] Although Count V of the Amended Complaint, labeled "Violation of the Railway Labor Act, 45 U.S.C. § 152 (Fourth)," refers to Section 152 Third as well, plaintiffs confirm in their motion papers that they assert no claim under Section 152 Third.

45 U.S.C. § 152, Fourth. Both plaintiffs and Company Defendants seek summary judgment on plaintiffs' Section 152 Fourth claim. Plaintiffs alternatively argue, in opposition to Company Defendants' motion, that fact issues remain precluding summary judgment against them.

Plaintiffs claim that American interfered with the process of ratifying the RPA by pressuring APFA to shorten the balloting period and to use a voting method and technology not previously used or sanctioned by the APFA Constitution. Then, plaintiffs assert, American interfered with the actual vote by conveying its message, not only to APFA leadership, but directly to employees, with the purpose of pressuring members to vote in favor of ratification. Finally, plaintiffs assert, American coerced APFA into reneging on its decision to set aside the April 16, 2003 ratification vote in light of American's disclosure of the SERP accounts, and then pressured APFA into dispensing altogether with membership ratification of the LOA. Company Defendants argue that Section 152 Fourth imposes a high standard on postcertification claims, a standard plaintiffs cannot meet. Alternatively, Company Defendants argue that plaintiffs' claims are precluded by the LOA which resolved all disputes between American and APFA.

Section 152 Fourth is addressed "primarily [to] the precertification rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants* ("*TWA*"), 489 U.S. 426, 440 (1989). Courts have inferred a right of action to individual employees in the precertification context, recognizing that, in the absence of a certified union and the administrative remedies that arise once a union is certified, individuals injured by violations of RLA Section 152 Fourth would be without remedy. *See Beckett v. Atlas Air*, 1995 U.S. Dist. LEXIS 11842, *3-4 (E.D.N.Y. Aug. 14, 1995); *see also Bensel*, 387 F.3d at 318. Notwithstanding this precertification focus, a narrow class of *post*certification claims under Section 152 Fourth may be

brought where "'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands'" of the RLA. *TWA*, 489 U.S. at 441, quoting *Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 300 (1943). Company Defendants do not dispute that an individual employee has an implied right of action in federal court under Section 152 Fourth in the postcertification as well as precertification context.

However, to establish the need for a federal court remedy for an alleged violation of Section 152 Fourth in the postcertification context, plaintiffs must show that

> the employer's conduct has been motivated by anti-union animus or an attempt to interfere with its employees' choice of their collective bargaining representative, or constitutes discrimination or coercion against that representative, or involves acts of intimidation [which] cannot be remedied by administrative means.

*Independent Union of Flight Attendants v. Pan Am. World Airways, Inc.* ("*IUFA*"), 789 F.2d 139, 142 (2d Cir. 1986) (internal quotation marks, citations, and ellipses omitted).[15] *IUFA* recognized that, although individual employees typically, with union representation, bring grievances before an RLA-created arbitral board, such efforts would be futile where, because of improper carrier conduct, the union's effectiveness and/or ability to defend its members' rights under the CBA are compromised. However, because the carrier conduct in *IUFA* was not motivated by anti-union animus and did not "destroy the effectiveness of the union representative," *id.*, the RLA's dispute resolution mechanism was functional. In other words, the system created by the RLA – dependent on effective union representation – had not broken down. As a result, the claim was

---

[15] Under *IUFA*, this test is one of subject matter jurisdiction over postcertification claims by a union under Section 152 Fourth. *IUFA*, 789 F.2d at 142. Since *TWA*, which recognized subject matter jurisdiction over postcertification claims by unions, the issue has sometimes been treated as one of sufficiency of the claim. *See, e.g., Brotherhood of Locomotive Engineers v. Kansas City S. Ry.*, 26 F.3d 787, 795 (8th Cir. 1994). In either event, the test is the same.

"administratively cognizable," precluding the district court from exercising subject matter jurisdiction. *Id.* at 43.

In a different postcertification context – the post-mediation self-help period under RLA Section 6 during which certain forms of economic force are permissible – the Supreme Court has held that courts should "hesitate to imply limitations on all but those forms of self-help that strike a fundamental blow to union or employer activity and the collective bargaining process itself." *TWA*, 489 U.S. at 442. *TWA* stressed that no employer or union conduct "prevented the scheme of the RLA from working" – that is, the conduct was not "inherently destructive of union or employer activity." *Id.* Although the dispute in this case did not arise in the post-mediation Section 6 context, the Supreme Court in *TWA* clearly viewed the availability of postcertification relief in federal court as existing only in extreme circumstances.

Accordingly, plaintiffs' argument, based on the statutory language of 45 U.S.C. § 152 Fourth, that they must show mere "interference" with the Union is not persuasive. Whatever the standard applicable where a union seeks a ruling on a postcertification claim in arbitration, the ability of individual plaintiffs to bring a postcertification claim under Section 152 Fourth in federal court is greatly circumscribed.

Company Defendants, for their part, argue that the very existence of collectively bargained agreements between APFA and the Company, namely, the RPA and the LOA, establish that any anti-union animus claim against them cannot succeed. Of course, courts look to the existence of a collectively bargained agreement as evidence of whether anti-union animus has been shown. *See, e.g., Dempsey v. Atchison, T. & S.F. Ry.*, 16 F.3d 832, 843 n. 8 (7th Cir. 1994) ("As an aside, it would seem that the phrase 'anti-union animus' refers to an employer's general hostility towards

union activity. Here, Santa Fe did not demonstrate antiunion hostility; in fact, it dealt favorably with a union, UTU, in executing Side Letter 11."), *cert. denied*, 513 U.S. 821 (1994); *Renneisen v. American Airlines, Inc.*, 990 F.2d 918, 918 (7th Cir. 1993).  However, Company Defendant's position, if accepted, would eliminate any possibility of a union member bringing a Section 152 Fourth claim challenging an agreement, even where the union's integrity has been utterly compromised by the company; therefore, it overstates the already difficult hurdle plaintiffs face. Instead, individual plaintiffs must show that anti-union conduct on the part of the carrier compromised the union's ability to represent its members such that individual employees have effectively been deprived of representation and to collective bargaining as contemplated by the RLA.

Company Defendants further argue that the LOA forecloses a postcertification Section 152 Fourth claim because its very purpose was to settle all claims between APFA and the Company. This argument also goes too far.  Were the LOA shown to be the product of coercion of the Union by the Company, a claim could be stated.

Here, plaintiffs fall far short of meeting their burden of producing facts sufficient to survive summary judgment.  Although plaintiffs identify several facts which, they assert, show Company interference and pressure exerted on APFA and individual members, these facts do not demonstrate anti-union animus, and they do not support a finding that American sought to or did compromise the integrity of APFA, whose leadership supported the agreement.  Stated another way, the evidence of the economic pressures which the Company brought to bear in obtaining both the RPA and the LOA does not support a finding by a reasonable factfinder that American was motivated by anti-union animus, or that the pressures were aimed at undermining or compromising the Union's

effectiveness. To the contrary, the economic pressures arose from a dire economic predicament to which, as the undisputed facts establish, APFA responded with independence of judgment. Further, that American withheld from APFA information regarding its SERP accounts is not evidence of a Company attempt to undermine APFA's ability to act as its employees' representative. Although American's conduct was deceptive, it did not compromise the integrity of the Union which, upon learning of the existence of the SERP accounts, responded by securing in the LOA concessions beneficial to the membership. No evidence suggests that this response, or any other APFA conduct, was not the product of the Union's independent judgment.

Similarly, plaintiffs' evidence that American interfered with individual employees' decisions whether to vote for or against ratification is insufficient to meet the standard for a postcertification Section 152 Fourth claim. The parties dispute whether statements relied on by plaintiffs, made to individual employees other than plaintiffs, to encourage them to ratify the RPA, constituted misconduct under RLA Section 152 Fourth. This dispute need not be addressed, however, as the standard in this postcertification case is anti-union animus – that is, the focus must be on the impact of carrier conduct on the Union, not on the individual employees. *See IUFA*, 789 F.2d at 142 (Section 152 Fourth prohibits "discrimination or coercion *against that representative*") (emphasis added). Under that standard, plaintiffs cannot succeed. Indeed, no evidence indicates that American's importuning of individual employees, conduct to which APFA objected, compromised the Union's independence or its ability to protect the interests of its members such that the efficacy of the RLA's dispute resolution mechanism was threatened.

In essence, plaintiffs seek to overturn the RPA and LOA because they disapprove of positions taken by APFA in reaching the agreements and they disagree with APFA's leadership that

the agreements are in APFA members' best interests. Based on the undisputed facts, they have failed to show that the integrity of the Union and its ability to bargain on the employees' behalf were compromised by Company conduct. As the Court of Appeals for the Seventh Circuit held in rejecting similar claims,

> RLA Section [152] was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest.

*Renneisen*, 990 F.2d at 924.

Accordingly, Company Defendants' motion for summary judgment with regard to plaintiffs' RLA Section 152 Fourth claim is granted, and plaintiffs' motion is denied.

## III.    Plaintiffs' DFR Claims

All parties seek summary judgment on plaintiffs' DFR claims. As detailed below, plaintiffs urge the court to adopt a "per se" standard of DFR liability. APFA meanwhile seeks judgment under traditional DFR standards enunciated in *Vaca v. Sipes*, 386 U.S. 171 (1967). Plaintiffs assert that, if the court applies *Vaca* and thus rejects their "per se" theory, issues of fact remain precluding summary judgment in APFA's favor. Company Defendants side with APFA and note further that carrier liability on a DFR theory does not lie in the absence of union liability.

### A.    The DFR Standard

"When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status . . . as the exclusive representative of the employees in the unit, to represent all members fairly." *Marquez v. Screen Actors Guild*, 525 U.S. 33, 44 (1998), citing, *inter alia*, *Vaca*, 386 U.S. at 177. The DFR requires a union "to serve the interests of all members without hostility or discrimination toward any, to

exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U.S. at 177. In other words, "a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* (internal citation omitted). To be discriminatory, union conduct must be "intentional, severe, and unrelated to legitimate union objectives," as in the case of invidious discrimination based on race or gender. *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301 (1971). "[B]ad faith requires a showing of fraudulent, deceitful, or dishonest action." *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001) (internal quotation omitted). "Judicial review of union action 'must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.'" *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998), quoting *O'Neill*, 499 U.S. at 67. Finally, if plaintiffs can satisfy the *Vaca* standard, they must then demonstrate "a causal connection between the union's wrongful conduct and their injuries." *Id.*

### B. Plaintiffs' Motion For Summary Judgment

According to plaintiffs, "'fair representation' means different things in different contexts." Pl. Br. 42. Conceding that the *Vaca* standard governs APFA's conduct during *negotiation* of the RPA, plaintiffs argue that APFA's conduct during the RPA *ratification* process – specifically, alleged violations of the APFA constitution – is subject to a "per se" standard of liability under which any such violation amounts to a DFR breach. This "per se" standard, plaintiffs assert, applies to all union conduct during the ratification process because the APFA constitution expressly reserves

ratification to the membership and prescribes rules governing ratification to which APFA is bound. *Id.* at 44. Then, arguing that American "participated" in APFA's "per se" DFR breaches, plaintiffs seek judgment holding APFA and Company Defendants jointly and severally liable for breach of APFA's DFR.

Plaintiffs provide no authority for their "per se" theory of liability, and the court is aware of none. In a related case, Judge Amon rejected this argument. *See Cooper, et al., v. TWA Airlines, LLC, et al.*, 274 F. Supp. 2d 231, 247 (E.D.N.Y. 2003). Simply put, the *Vaca* standard "applies to all union activity." *O'Neill*, 499 U.S. at 67. Because the Court rejects plaintiffs' "per se" theory of DFR liability, their motion for summary judgment on their DFR claims, predicated solely on that theory, is denied.

### C.     APFA's Motion For Summary Judgment

APFA moves for summary judgment on the ground that none of its conduct during negotiation or ratification of the RPA and subsequent LOA fell below the *Vaca* DFR standard. APFA asserts that a union's DFR permits it to apply its constitution flexibly in a manner that the union, in the exercise of its judgment, determines will best protect the represented employees' interests, particularly when faced, as was APFA, with dire circumstances. APFA argues that entering the RPA in an expedited fashion was the only alternative to the near-certainty that American would file for bankruptcy, leaving APFA's membership in a position worse than that contemplated by the concessionary agreement. Then, APFA argues, by entering the April 25, 2003 LOA, it chose to maintain the RPA, now with additions beneficial to APFA's membership, to once again avoid a dire bankruptcy scenario. Plaintiffs assert that issues of fact remain which preclude APFA's motion for summary judgment on the DFR claims.

There is no dispute that APFA was concerned about the strong possibility that, in the absence of significant concessions from the union, American would file for bankruptcy, subjecting union members to employment conditions more onerous than those sought via concession. Viewing APFA's conduct during the negotiating and ratification of the RPA and LOA favorably to plaintiffs, though with appropriate deference to the union, *see Spellacy*, 156 F.3d at 126, APFA's actions were rational and not arbitrary. APFA was faced with the credible threat that, unless it agreed to $340 million in annual concessions by the March 31, 2003 and April 15, 2003 deadlines imposed by American, the company would file for bankruptcy. It is undisputed that American represented to APFA that, in bankruptcy, it would ground 85 to 90 airplanes, causing 2,500 more flight attendant furloughs than if it reached agreement outside of bankruptcy, and that it would seek to impose an additional $130 million in labor cost reductions. The evidence establishes that APFA's leadership reasonably believed it had reached the best solution possible on behalf of its members. Therefore, no finding of hostility or bad faith is warranted.

Nor have plaintiffs shown an issue of fact as to whether APFA's decision to accept American's offer to extend the balloting period for 31 hours was arbitrary or made in bad faith. To the contrary, the undisputed evidence establishes that, consistently throughout the initial balloting period, APFA had sought an extension, but American rebuffed these requests, insisting that, if the RPA were not ratified by the April 15, 2003 deadline, American would file for bankruptcy. The evidence also establishes that Ward was concerned that some members were having technical difficulties with voting and that members had complained about not receiving final contract language until April 8, 2003. Also, Ward and Carty were aware that APA, the pilots' union, had received reports that some APFA members expressed to APA-represented pilots a desire to change

their votes, as APA and TWU members had been able to do throughout the balloting. In fact, Ward thought a one-day extension insufficient, and he requested an extension of several days, which the Company refused. Because Ward consistently sought more time for APFA members to consider the proposed RPA, APFA's acceptance of American's offer for an extension, once finally extended, cannot be viewed as arbitrary or in bad faith. Indeed, no evidence indicates that, as plaintiffs suggest, APFA's interest in the extension was based on anything other than its good faith assessment of its members' best interests.

As for APFA's decision to enter the LOA without membership ratification, Article XI § F of the APFA Constitution required ratification only if the Executive Committee determined that the alterations to the RPA embodied in the LOA were "substantial." But whether or not the alterations were substantial, APFA's decision to enter into it cannot be considered irrational or arbitrary in light of its reasonable fear that American would file for bankruptcy in the absence of agreement. Plaintiffs offer no evidence that APFA's decision to enter the LOA was "fraudulent, deceitful, or dishonest," *White*, 237 F.3d at 179, and thus no finding of bad faith is warranted.

Finally, in a conclusory manner, plaintiffs argue that APFA's conduct amounted to discrimination against its members in violation of its DFR. However, no evidence indicates that APFA's conduct was "unrelated to legitimate union objectives" or invidious. *Amalgamated*, 403 U.S. at 301. Plaintiffs have therefore failed to raise a triable issue of fact as to discrimination.

Plaintiffs raise several fact issues which they argue preclude summary judgment in APFA's favor. First, plaintiffs have produced evidence indicating that APFA's conduct did not comply with its constitution. With regard to ratification of the RPA, evidence indicates that APFA arranged for telephonic balloting to be conducted over a 15-day period, in accordance with the determination

made by the BOD in its March 19, 2003 resolution. However, the constitution requires mail-in balloting over at least 30 days. *See above* Facts § III(A), n. 6. Also, evidence indicates that, although it was required to provide members with the complete changes embodied in the RPA either at the start of or prior to the balloting period, *see id.*, APFA did not do so. Finally, APFA entered the April 25, 2003 LOA without membership ratification. *See id.* However, "in light of both the facts and the legal climate that confronted [APFA] at the time the decision[s were] made," *O'Neill*, 499 U.S. at 78, as discussed above, no reasonable jury could find these actions "arbitrary, discriminatory, or in bad faith," *id.* at 67.

Second, plaintiffs submit that an issue of material fact exists with regard to whether APFA acted in bad faith or arbitrarily when its BOD passed the March 19, 2003 resolution interpreting the APFA constitution as providing for telephonic balloting over a 15-day period rather than mail-in balloting over 30 days.[16] Based on the undisputed fact that the Constitution Committee members stated they "never contemplated the potentially urgent need for ratification that can arise – as it apparently has now – in the context of concessionary bargaining," plaintiffs argue, "[a] jury could reasonably find . . . that the Union could not in good faith 'interpret' language to have a meaning that the drafters of the language state they never intended." However, the Constitution Committee stated that abiding by the 30-day provision in this context "would be inconsistent with the spirit of

---

[16] Pursuant to the APFA Constitution, the Executive Committee is authorized to interpret the Constitution subject to the approval of the BOD. APFA Const. Art. III §3(L)(10), Art. XI § 1(F). "[T]he Board of Directors may override Executive Committee rejection of a proposed Collective Bargaining Agreement." Art. III § (3)(L)(10). "The Executive Committee shall act as the agent for and on behalf of the Voting Board of Directors, and shall interpret this Constitution, subject to the approval of the Board of Directors." Art. III § (4)(A). "An affirmative vote by a majority of those active members in good standing who return valid ballots shall be required for the passage of any proposed alteration, addition, deletion or amendment." Art. III § 1(B). "[F]inal control of the APFA shall be vested in the membership." Art. III § (2)(A).

the Constitution." Under these circumstances, and on the undisputed facts, no reasonable jury could conclude that the BOD's interpretation was arbitrary or made in bad faith. Finally, notwithstanding that APFA chose not to heed the Constitution Committee's advice to seek a declaratory judgment with regard to this interpretation of the constitution, *see above* Facts § III(A), no evidence indicates that APFA did so with "improper intent, purpose, or motive," *Spellacy*, 156 F.3d at 126, such that a finding of bad faith may be warranted. All evidence indicates that APFA's motive was to avoid an American bankruptcy and thereby preserve its members' interests.

Third, plaintiffs assert that the following evidence gives rise to an issue of material fact with regard to whether APFA acted in bad faith: (1) at the time APFA's financial advisor Mark King delivered his report on American's deteriorating financial condition, he was unaware that American would soon receive over $1 billion in aid from the government; and (2) American's cash balance would remain "fairly steady through June 30, right around the $1 billion mark." Jeffrey Campbell (former American Chief Financial Officer) Dep. 109. This evidence does not raise a triable issue of fact as to whether, at the time APFA relied on King's report, among other sources of information, it did so in bad faith.

Fourth, although there is a factual dispute as to what details APFA and Company officials knew about the vote tally, that dispute is not material as APFA and American do not dispute that the decision to extend the voting period for one day was made, in part, because APFA and the Company knew ratification would fail. Indeed, APFA's April 15, 2003 Resolution accepting the Company's offer of an extension explicitly states, "WHEREAS, the APFA membership has voted to reject the Company proposal by a very slim margin. . . ." Thus, APFA's knowledge with respect to the actual vote tally is irrelevant; the RPA's imminent failure was known. In any event, even if APFA had

actual knowledge of the vote tally prior to agreeing to the extension, no evidence indicates that APFA's decision to extend the voting was made with "improper intent, purpose, or motive." *Spellacy*, 156 F.3d at 126. The court sees no basis for holding that APFA could not consider the likelihood ratification would fail in determining whether to agree to the extension.

Finally, plaintiffs proffer certain additional evidence which they assert creates a disputed issue of fact as to whether APFA acted arbitrarily or in bad faith, including evidence that (1) a significant number of APFA members experienced difficulties accessing the voting system; (2) some members were unable to vote because they had not received PIN numbers; (3) prior to accepting American's offer to extend the voting period and give members the opportunity to change their votes on April 15, 2003, APFA had, on April 10, 2003, considered and rejected the idea that members should be permitted to re-vote and/or change votes; and (4), after deciding to conduct a re-vote in the wake of American's disclosure of the SERP accounts, APFA reversed itself and entered the April 25, 2003 LOA. None of this evidence creates a triable issue of fact as to bad faith or arbitrariness.

In sum, evidence adduced by plaintiffs in opposition to APFA's motion for summary judgment fails to raise a triable issue of fact as to whether APFA's conduct was arbitrary, discriminatory, or in bad faith. Based on the record evidence, no reasonable jury could find that APFA's conduct fell below the *Vaca* standard. Therefore, APFA's motion for summary judgment with regard to plaintiffs' DFR claims is granted.

### D.  Company Defendants' Motion For Summary Judgment

Because employer liability on a DFR theory is derivative of union liability, Company Defendants' motion for summary judgment with regard to plaintiffs' DFR claims is granted. *Simberlund v. Long Island R. Co.*, 421 F.2d 1219, 1228 (2d Cir. 1970).

**IV.     Plaintiffs' Claim for Breach of the Union Constitution**

Plaintiffs have remaining a claim against APFA for "breach of the union constitution," which they contend is a breach of contract claim under New York law. APFA moves for summary judgment on this claim, construing it as a claim for breach of APFA's DFR. The allegations underlying plaintiffs' claim for "breach of the union constitution" are, in substance, identical to those in plaintiffs' DFR claims. This claim is therefore a "mere refinement" of the duty of fair representation and, as such, preempted by federal law. *See Cooper v. TWA Airlines, LLC*, 349 F. Supp. 2d 495, 507-08 (E.D.N.Y. 2004); *Marcoux v. Am. Airlines, Inc.*, 2006 U.S. Dist. LEXIS 14130, * 22 n. 4 (E.D.N.Y. Mar. 28, 2006). APFA's motion for summary judgment with regard to this claim is granted.

## CONCLUSION

For the reasons set forth above, the motions for summary judgment filed by Company Defendants and APFA are granted in their entirety. Plaintiffs' motion for summary judgment is denied, and their motion for class certification is dismissed as moot. The Clerk of Court is directed to enter judgment for the defendants.

**SO ORDERED.**

     **/S/ Nina Gershon**
**NINA GERSHON**
**United States District Judge**

**Dated:  July 22, 2008**
          **Brooklyn, New York**